UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **ASHLEY CAMERON-LEDFORD**<br>    Plaintiff<br><br>vs<br><br>**SUMNER COUNTY, TENNESSEE, JANET BOZARTH, HILLARY FOX, HENDERSONVILLE, TENNESSEE, DAVID HOLSCHER, SOUTHERN HEALTH PARTNERS, INC., "NURSE" SHARON, C. KELLEY**,<br>    Defendants | Case No.<br><br>Hon.<br><br>**JURY DEMAND** |

# COMPLAINT

## JURISDICTION AND VENUE

1. This action is brought by Plaintiff pursuant to 42 U.S.C. 1983 and the common and statutory laws of the State of Tennessee to redress the violation by Defendants of Plaintiff's rights secured by the Fourth, Fourteenth, and Eighth Amendments to the United States Constitution. This Court has jurisdiction under 28 U.S.C. § 1331 to hear Plaintiff's claims arising under the Constitution and laws of the United States and under 28 U.S.C. § 1343 to hear Plaintiff's claims to recover damages and to secure equitable relief under any Act of Congress providing for the protection of civil rights.

2. This Court has supplemental jurisdiction over all state law claims alleged in this complaint under 28 U.S.C. § 1367 as there is a common nucleus of operative facts between the state and federal law claims.

3. Venue is appropriate in the Middle District of Tennessee under 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred. Additionally, the defendants to this action are deemed to reside in this district under 28 U.S.C. § 1391(c) and the individual defendants reside in this district; thus, venue is also appropriate under 28 U.S.C. § 1391(b)(1).

## PARTIES

4. Plaintiff is a resident of Hendersonville, Sumner County, Tennessee.

5. Defendant Sumner County is a political subdivision of the State of Tennessee and operates a county jail and workhouse under the supervision, direction, and control of the Sumner County Sheriff. Defendant Sumner County contracts with Southern Health Partners to provide for the healthcare needs of individuals housed at the Sumner County jail. Sumner County also employs judicial commissioners to perform statutory duties of determining probable cause and setting bail for new arrestees.

6. Defendant Janet Bozarth is an employee of the Sumner County Sheriff's Department who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

7. Defendant Hillary Fox is an employee of the Sumner County Sheriff's Department who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

8. Hendersonville, Tennessee is a municipal corporation of the State of Tennessee and operates a police department.

9. Defendant David Holscher is an employee of the Hendersonville Police Department who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee and Sumner County.

10. Defendant Southern Health Partners, Inc., is a corporation formed in Delaware with a principal office of 2030 Hamilton Place Blvd., Suite 140, Chattanooga, Tennessee, 37421-6039. Defendant's Registered Agent for service of process is CT Corporation System, 800 S. Gay St., Suite 2021, Knoxville TN 37929-9710. Defendant contracts with the Sumner County jail to provide medical services for individuals under the custody of the Sumner County Sheriff and thus performs an essential state function as a state actor.

11. Defendant "Nurse" Sharon is an employee of Defendant Southern Health Partners who, at

the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

12. Defendant C. Kelley is an employee of Defendant Southern Health Partners who, at the time of the incidents giving rise to this claim, was acting under color of law, and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee, Sumner County, and Southern Health Partners.

## GENERAL ALLEGATIONS

13. On February 28, 2013, Plaintiff was approached by Hendersonville Police Department Officer David Holscher as she was leaving her prescription at a Walgreens located at 365 New Shackle Island Rd, Hendersonville, Tennessee. Officer Holscher instructed Plaintiff to step out of her car to perform field sobriety tests.
14. Plaintiff informed Officer Holscher that she was suffering from pneumonia and did not feel well and that she could not perform any tests successfully.
15. Officer David Holscher then asked Plaintiff if she would consent to a blood draw to which she agreed.
16. Officer Holscher transported Plaintiff to Sumner County Regional Hospital where a nurse attempted to take blood. However, Plaintiff was so severely dehydrated that no blood would draw despite several attempts. Officer Holscher then took custody of the plaintiff again and instead of insisting on medical treatment for dehydration and pneumonia, both conditions which he was aware of, he transported her back to the county jail for booking.
17. During the booking process the plaintiff informed Officer Holscher and jail personnel that she was taking medication for heart disease and high blood pressure. She also indicated that because of gastric bypass surgery, she was required to eat six times per day. She also indicated that she had a mitral valve replacement in May, 2012 and that she fractured easily. She also informed the booking officer that she was not feeling well, including that she was dehydrated and suffering from pneumonia.
18. People with mitral valve replacement are more likely to suffer from blood clots and must remain on blood thinner medication for the rest of their lives.

3

19. Despite knowing the plaintiff's medical condition, including dehydration, pneumonia, mitral valve surgery, risk of blood clots, and nutritional needs secondary to gastric bypass, no one at the Sumner County jail arranged for an immediate examination by a licensed physician and all her medications, including blood thinner, were summarily removed.

20. Plaintiff had her bond set at $10,000 by Judicial Commissioner R. Gann on a charge of DUI Second and without considering any of the statutory factors required by state law. This bond amount was excessive in that it was far more than is usually set for individuals charged with DUI 2nd or similar classifications of offense.

21. For example, the following bail amounts were set for individuals arrested and charged with second offense driving under the influence (DUI 2nd) on the indicated dates:
    a. May 2, 2009 David Leon Carter $2500;
    b. May 4, 2009 Anthony Dean Simmons $2500;
    c. May 5, 2009 Robert Sharklet $2500;
    d. May 7, 2009 Seth M. White $2500;
    e. May 9, 2009 Glenda F. Reed $2500;
    f. May 9, 2009 Virgil Albert Nuckols $2500;
    g. May 17, 2009 Paul W. Holmes $2500.

22. On February 28, 2013, at 1:10 pm, Plaintiff was strip searched (without reasonable suspicion) by Officer Hillary Fox (Badge No. 351) and issued some standard hygiene and bedding items.

23. On February 28, 2013, at 2:00 pm, Plaintiff was seen by a nurse employed by Southern Health Partners, LLC and ordered to remove two fentanyle patches she had on her body to control pain. This nurse noted that Plaintiff had "multiple health problems" and that her pupils were "slightly sluggish" and her skin "warm [and] dry". However, no further medical care was provided and despite high risk of blood clot, Plaintiff was not provided with her regular anticoagulant medication.

24. Initially, Plaintiff was assigned to a bottom bunk in Cell 204. Because of problems with her cellmate, Plaintiff was moved to Cell 111.

4

Case 3:14-cv-00592   Document 1   Filed 02/28/14   Page 4 of 18 PageID #: 4

25. As Plaintiff was being put into the new cell, she informed Officer Janet Bozarth that she needed a bottom bunk because she suffered from dehydration, was not feeling well and was experiencing dizzy spells and feared falling from the upper bunk and that she was afraid of heights. Officer Bozarth told her that this was not the Holiday Inn and that she did not get to choose which bunk she slept in.

26. Despite her medical condition and her request for a lower bunk due to her medical condition, Plaintiff was forced to use a higher bunk in her cell. She climbed up to the top, third bunk and stayed there waiting for sick call.

27. Officer Regina Goodman was preparing to pull inmates for sick call (including Plaintiff, who had requested sick call) and confirmed with Plaintiff that she wanted to go to sick call. As Officer Goodman continued with other inmates, Plaintiff started climbing down from her bunk and, at approximately 8:00 am on March 1, 2013, fell onto the floor. Officer Goodman was summoned by another inmate who told her Plaintiff had fallen from the top bunk. Officer Goodman radioed the tower and requested medical assistance. Nurses Sharon and Sherill (first names unknown), who had been on another floor, also responded to Plaintiff's cell as did Officer Bozarth.

28. The nurses instructed Officer Bozarth to just bring Plaintiff to sick call. Plaintiff was taken to medical in a wheelchair and "evaluated" by Nurse Sharon, who is not a physician or other licensed healthcare provider authorized to diagnose or treat medical conditions. Nurse Sharon asked Plaintiff if she could wiggle her toes and when Plaintiff responded that she could Nurse Sharon said, "well, then it's not broke". Plaintiff then insisted that her hip was broken but again Nurse Sharon said, "no, you can wiggle your toes. It's not broke." Plaintiff was given Ibuprofen and sent back to her cell in the wheelchair.

29. The ability or inability to wiggle one's toes is not a symptom or indicator of a broken hip. A hip fracture is a serious injury with possible complications that can be life-threatening. Valid indicators of a broken hip are the inability to move immediately after a fall, severe pain in the hip or groin, and the inability to put weight on the leg on the side of the injury, all symptoms that Plaintiff exhibited.

30. Additionally, Plaintiff had several risk factors for a broken hip, including her gender

(female) and insufficient nutrition from gastric bypass, most importantly insufficient calcium absorption.

31. Back at her cell, Officer Bozarth again tried to tell Plaintiff to get back up to her top, third bunk. Plaintiff protested and said she could not do the top bunk. Officer Bozarth then reluctantly allowed her to take the bottom bunk. As Plaintiff attempted to go from the wheelchair to her bunk, she leaned on Officer Bozarth for support. Officer Bozarth said, "do not touch me. I can see that as a forceful movement towards me and I will put you down on the ground. Do not touch me!" Plaintiff asked to have the wheelchair pushed closer to the bunk and that way she was able to get on the bunk. Officer Bozarth took the wheelchair out and closed the cell door, leaving Plaintiff alone in her cell (her cellmates had been moved at this point).

32. After about 10-15 minutes back in her cell, Plaintiff needed to use the restroom so she started yelling for help. Other inmates heard and started banging and making a commotion to attract the attention of guards.

33. When Officers Bozarth and Davis entered the cell, Plaintiff said she needed to use the restroom. Bozarth said she just needed to go and that there was nothing wrong with her, that nothing was broken, she just needed to get over it, and put her weight on the leg and walk to the toilet herself.

34. Plaintiff tried to take a few steps but it was too painful and she was unable to walk the distance from her bunk to the toilet. Plaintiff again said she could not do it and Bozarth said she had two options: sit on the bunk or walk to the toilet. Plaintiff said she was not able to walk that she needed her assistance and Bozarth said Plaintiff was "not going to touch me", meaning Plaintiff could not use Bozarth for assistance.

35. Plaintiff said she really did not want to defecate on herself. Bozarth and Davis said that if she really needed to go she could get there. They left the cell and closed the door.

36. Plaintiff remained on her bunk and twice defecated in her clothes and laid there in her feces until around 6:00 pm when she bonded out and was released.

37. Around 6 pm, Officer Bozarth and Nurse C. Kelley entered the cell and informed the plaintiff that she had made bond. Plaintiff asked if she could get the wheelchair because

she could not walk. Bozarth said "no, we got the wheelchair from another inmate. That is his wheelchair and I'm not going to get it for you because I know nothing is broke and I know you can walk."

38. When Plaintiff asked if her father could come in and get her, Kelley threatened to report that the plaintiff "refused to walk". Despite noticing that the plaintiff had "bowel incontinence" throughout the afternoon, Kelley did nothing to assist her or clean her up.

39. Bozarth told Plaintiff that she needed to try to walk and that if she did not try to walk she would tell Plaintiff's family that she refused to be released and just lock her back up in her cell. Plaintiff tried using the sink and bunk to support herself. Plaintiff started to cry when Bozarth left and returned about 10 minutes later with the wheelchair.

40. At the front of the jail, Plaintiff's mother was told by an officer that Plaintiff was refusing to leave her cell.

41. Bozarth wheeled Plaintiff to the hallway outside the pod where another officer wheeled her to the front of the jail.

42. At the front of the jail, Plaintiff's father approached and asked if they could wheel her to the car. Officer Lesli Bean refused to allow Plaintiff's father to take the wheelchair to the car saying the wheelchair belonged to another inmate and she could not allow it to leave the building. Plaintiff then got out of the wheelchair and sat on a stool. Plaintiff's father then called 911 for an ambulance.

43. The ambulance arrived about 6:23 pm and transported Plaintiff to Sumner County Regional Emergency Room arriving at about 6:55 pm. EMT Honey Magee noticed Plaintiff's left leg rotated outward and could not start an IV.

44. At Sumner Regional Hospital, Plaintiff was still so dehydrated that a nurse tried and failed to obtain blood three times and had to start a peripheral IV. X-rays were taken and Plaintiff was diagnosed with a left hip fracture and recent pneumonia. Plaintiff was cleaned of her feces and taken back for immediate surgery for an intertrochanteric hip fracture with intramedullary nailing.

45. After surgery to repair the fractured hip, Plaintiff suffered from postoperative anemia and was transferred to the rehabilitation center for recovery.

7

46. On March 6, 2013, Plaintiff was readmitted to the hospital for the anemia due to acute blood loss, hypokalemia and potassium deficiency and continued to suffer monoplegia to her left lower extremity as a result of the hip fracture.

## COUNT I

(1983 - Sumner County)

(medical treatment and strip search)

47. Sheriff Sonny Weatherford, in his official capacity as Sheriff of Sumner County, developed and maintained policies or customs exhibiting deliberate indifference to the constitutional rights of persons incarcerated in the Sumner County jail and of persons coming in contact with his deputy sheriffs and jailers, all of which caused the violation of the Plaintiff's rights.

48. It was the policy and custom to inadequately and improperly investigate incidents of misconduct by subordinate members of the Sumner County Sheriff's Department, and acts of misconduct were instead tolerated by Sheriff Sonny Weatherford, in his official capacity, including but not limited to previous incidents of refusal of medical treatment committed by jail personnel. In fact, practices by Sumner County deputies of denying medical treatment to inmates goes as far back as 2001.

49. It was the policy and custom of Sheriff Weatherford, in his official capacity, to inadequately supervise and train his subordinates, including the individually named defendants/employees of Sumner County, thereby failing to adequately discourage further constitutional violations on the part of his officers. The following are illustrative of the failure to supervise and train and of the deliberate indifference to the rights of inmates:

   a. Failure to require entry of medical reports in prison records when medical attention was required for an inmate;

   b. Failure to have competent designated medical authority;

   c. Failure to arrange for physical examinations to be given by someone under a physician's supervision;

   d. Failure to provide medical training for jail personnel;

   e. Failure to arrange for timely and regular medical personnel to address inmate

medical needs;

    f.    Entering into a contract for medical care that provided a disincentive for the physician to physically exam inmates.

    g.    Failure to maintain and enforce a written policy prohibiting unreasonable strip searches of inmates;

    h.    Failure to properly and forcefully discipline other acts of misconduct by employees;

    i.    Failure to institute bed assignment policies to prevent at-risk inmates from having to sleep in bunks high off the floor;

    j.    Failure to provide guard rails on upper bunks to prevent falls.

50.    The failure to provide inmates with needed medical care was not reasonably related to any legitimately related governmental or penalogical objective.

51.    It was the policy, custom and practice to inadequately and improperly provide for the medical needs of inmates at the Sumner County jail.

52.    It was and is the policy, practice and custom of Sumner County, through its principal policy maker and decision maker, Sheriff Weatherford, to inadequately and improperly investigate practices of strip searching inmates and denial of medical care of inmates, and acts of misconduct were instead tolerated by Defendant, including, but not limited to, the following incidents:

    a.    Delay of necessary medical treatment;

    b.    Medical evaluation and diagnosis by inadequately trained corrections officers or nurse aides or practical nurses not licensed to diagnose or treat illness or injury;

    c.    Failure to properly train corrections officers in recognizing emergency and urgent care situations;

53.    Defendant Sumner County knew or should have known of such acts of misconduct by its jail personnel and Sheriff and that the medical care available was inadequate.

54.    As a result of the above described policies, practices and customs, the individually named defendants believed their actions would not subject them to possible punishment by their employer, Sumner County, and that misconduct would not be investigated or sanctioned,

but would instead be tolerated.

55. The above described policies, practices and customs demonstrated a deliberate indifference on the part of policymakers of Sumner County to the constitutional rights of persons under the care, custody and control of the Sheriff, specifically their rights under the 4th, 8th and 14th Amendments to the U.S. Constitution against unreasonable seizure and cruel and unusual punishment, and were the cause of the violations of the Plaintiff's rights alleged in this complaint.

56. The official authorization and pervasive pattern of the above challenged conduct, evidenced in part by the lack of disciplinary action against the individually named defendants and for previous and on-going incidents involving improper strip searches and failure to provide seriously needed medical attention, show a likelihood of recurrence that is objectively unreasonable.

57. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, some of which is ongoing, and medical costs.

## COUNT II

(1983 - Sumner County)

(excessive bail)

58. Defendant Sumner County, by knowingly and deliberately instituting and approving of a system where bail is arbitrarily and subjectively set by a judicial commissioner, who has final decision making authority as to bail at the time of arrest, based on something other than the statutory elements or an individualized determination of the need for bail, violated the Constitutional rights of Plaintiff.

59. Denying bail or requiring bail in an amount higher than that which is individually calculated to serve as an assurance of the presence of a particular person accused of an offense as required by the Bail Reform Act is excessive.

60. Admitting others to bail with a set dollar amount required who were similarly situated as to the class of charge while setting Plaintiff's bail at four times the usual amount effectively made plaintiff's bail grossly disproportionate to the gravity of the offense.

61. Plaintiff's bail was excessive relative to the charged offense or based on the particular

facts of her case.

62. Since the judicial commissioner never questioned the plaintiff and never considered all the statutory factors related to risk of non-appearance, the facts available to the judicial commissioner were too weak to justify the amount of bail and were impermissibly based on mysterious subjective factors not articulated in the record.

63. In effect, Plaintiff's bail was not normal for charges like those brought against the plaintiff or for offenses with like penalties and the judicial commissioner relied on impermissible factors in setting bail.

64. Accordingly, Plaintiff's Constitutional rights were violated as follows:
    a. Excessive bail in violation of the Eighth Amendment because
        i. Plaintiff's bail set by the judicial commissioner was excessive relative to the charged offense and based on the particular facts of plaintiff's case;
        ii. The bail by the judicial commissioner was excessive in terms of what is normal for like charges;
        iii. The bail was not based on an individualized assessment of the plaintiff's likelihood of non-appearance or danger to the community.
    b. Violation of equal protection under the Fourteenth Amendment because
        i. Plaintiff's bail was different for others similarly situated in terms of class of offense;

65. As a direct and proximate result of the acts of Defendant, Plaintiff had her Constitutional right against the setting of excessive bail and her right to equal protection violated.

## COUNT III
(T.C.A. 8-8-302 - Sumner County)

66. Defendants Bozarth and Fox were appointed by the Sheriff at the time of their actions and were within the scope of their employment and were acting by virtue of or under color of the office. Therefore Defendant Sumner County is liable for the actions of the individually named defendants as described above and below and under each count pursuant to T.C.A. 8-8-302.

11

Case 3:14-cv-00592   Document 1   Filed 02/28/14   Page 11 of 18 PageID #: 11

## COUNT IV

### (1983 - Bozarth)

### (cruel indifference to medical need)

67. Defendant Bozarth, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th, 14th, and 8th Amendments to the U.S. Constitution by deliberately and intentionally failing to provide first aid or other medical attention to the Plaintiff's serious injury;

68. Defendant refused to provide assistance to the plaintiff for a serious injury that was obvious, that is, a fractured hip, and, with callous indifference and malicious motivation to punish, forced the plaintiff to defecate on herself several times and lay there in her own feces and tried to force the plaintiff to walk on a fractured hip, causing immense pain.

69. As a direct and proximate result of the said acts of Defendants, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

70. The actions of Defendant violated clearly established and well settled federal constitutional rights of pretrial detainees as guaranteed by the 4th, 8th and 14th Amendments to the U.S. Constitution.

## COUNT V

### (1983 - Fox)

### (strip search)

71. Defendant Hillary Fox, under color of law, violated the plaintiff's constitutional rights as guaranteed by the 4th and 14th Amendments to the U.S. Constitution by deliberately and intentionally strip searching the plaintiff without reasonable suspicion.

72. The strip search of the plaintiff did not seek to strike a reasonable balance between inmate privacy and the needs of the jail because it was not performed in conformance with any such blanket policy after due consideration of the balancing interests. In fact, strip searches of new arrestees is *ad hoc* and under the subjective discretion of any one particular corrections officer, in this case, Officer Fox.

73. Nor was the strip search reasonable because most of those arrested for DUI are released on bail in short order, can be temporarily detained in a holding cell without admission to

the general population, and so do not present the type of security concerns which are designed to be addressed by a strip search.

74. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced embarrassment and humiliation.

75. The actions of Defendant violated clearly established and well settled federal constitutional rights of pretrial detainees as guaranteed by the 4th and 14th Amendments to the U.S. Constitution.

## COUNT VI

(1983 - Hendersonville)

76. Hendersonville Police Department developed and maintained policies, practices or customs exhibiting deliberate indifference to the constitutional rights of persons detained in Hendersonville, Tennessee and of persons coming in contact with its officers, all of which caused the violation of the Plaintiff's rights.

77. It was the policy, practice and custom to inadequately and improperly investigate incidents of misconduct by subordinate members of the police department and acts of misconduct were instead tolerated.

78. It was the policy, practice and custom of Hendersonville Police Department to inadequately supervise and train its officers, including the individually named defendant/employee of Hendersonville, thereby failing to adequately discourage further constitutional violations on the part of its officers. The following are illustrative of the failure to supervise and train and of the deliberate indifference to the rights of inmates:

   a. Failure to provide medical training for police officers so as to recognize the need for medical treatment of serious medical conditions;

79. The failure to provide detainees with needed medical care was not reasonably related to any legitimate governmental or penological objective.

80. It was the policy, custom and practice to inadequately and improperly provide for the medical needs of detainees under the custody of Hendersonville police officers.

81. It was and is the policy, practice and custom of Hendersonville to inadequately and improperly investigate incidents of denial of medical care of detainees and acts of

13

misconduct were instead tolerated by Defendant, including, but not limited to, the following incidents:

    a.    Denial of needed medical care despite the knowledge that the plaintiff was severely dehydrated;

    b.    Failure to properly train officers in recognizing emergency and urgent care situations;

82. Defendant knew or should have known of such acts of misconduct by its personnel.

83. As a result of the above described policies, practices and customs, the individually named defendant believed his actions would not subject him to possible punishment by his employer, Hendersonville Police Department, and that misconduct would not be investigated or sanctioned, but would instead be tolerated.

84. The above described policies, practices and customs demonstrated a deliberate indifference on the part of policymakers of Hendersonville to the constitutional rights of persons under the care, custody and control of its officers, specifically their rights under the 4th, 8th and 14th Amendments to the U.S. Constitution against deliberate indifference to serious medical needs, and were the cause of the violations of the Plaintiff's rights alleged in this complaint.

85. The official authorization and pervasive pattern of the above challenged conduct, evidenced in part by the lack of disciplinary action against the individually named defendant show a likelihood of recurrence that is objectively unreasonable.

86. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, some of which is ongoing, and medical costs.

## COUNT VII
(1983 - Holscher)

87. Defendant Holscher, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th, 8th, and 14th Amendments to the U.S. Constitution by deliberately and intentionally failing to provide first aid or other medical attention to the Plaintiff's serious injury;

88. Defendant refused to provide assistance to the plaintiff for a serious injury that was

obvious, that is, severe dehydration and ongoing pneumonia, and, with callous indifference only wanted blood drawn to justify his arrest of the plaintiff.

89. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

90. The actions of Defendant violated clearly established and well settled federal constitutional rights of pretrial detainees as guaranteed by the 4th, 8th and 14th Amendments to the U.S. Constitution.

## COUNT VIII

(1983 - Southern Health Partners)

91. Defendant Southern Health Partners developed and maintained policies, practices or customs exhibiting deliberate indifference to the constitutional rights of persons detained in Sumner County, Tennessee and of persons coming in contact with its medical staff, all of which caused the violation of the Plaintiff's rights.

92. It was the policy, practice and custom to inadequately and improperly investigate incidents of misconduct by subordinate members of the staff and acts of misconduct were instead tolerated.

93. It was the policy, practice and custom of Southern Health Partners to inadequately supervise and train its medical staff, including the individually named defendants/employees, thereby failing to adequately discourage further constitutional violations on the part of its staff. The following are illustrative of the failure to supervise and train and of the deliberate indifference to the rights of inmates:

   a. Failure to provide medical training for its staff so as to recognize the need for medical treatment of serious medical conditions, such as dehydration and broken bones

   b. Failure to prohibit a person who is not a licensed physician from diagnosing and treating serious illness or injury;

   c. Failure to provide for imaging equipment so as to allow for expeditious determination of broken bones.

94. The failure to provide detainees with needed medical care was not reasonably related to

15

any legitimate governmental or penological objective.

95. It was the policy, custom and practice to inadequately and improperly provide for the medical needs of detainees under the custody of the Sumner County jail.

96. It was and is the policy, practice and custom of Southern Health Partners to inadequately and improperly investigate incidents of denial of medical care of detainees and acts of misconduct were instead tolerated by Defendant, including, but not limited to, the following incidents:

    a. Denial of needed medical care despite the knowledge that the plaintiff was severely dehydrated;

    b. Denial of needed medical care despite the knowledge that the plaintiff had a high chance of a broken hip;

    c. Failure to properly train staff in recognizing emergency and urgent care situations;

    d. Failure to discipline the nurses who refused medical treatment to the plaintiff or improperly diagnosed her.

97. Defendant knew or should have known of such acts of misconduct by its personnel.

98. As a result of the above described policies, practices and customs, the individually named defendants believed their actions would not subject them to possible punishment by their employer, Southern Health Partners, and that misconduct would not be investigated or sanctioned, but would instead be tolerated.

99. The above described policies, practices and customs demonstrated a deliberate indifference on the part of policymakers of Southern Health Partners to the constitutional rights of persons under the care, custody and control of the Sumner County jail, specifically their rights under the 4th, 8th and 14th Amendments to the U.S. Constitution against deliberate indifference to serious medical needs, and were the cause of the violations of the Plaintiff's rights alleged in this complaint.

100. The official authorization and pervasive pattern of the above challenged conduct, evidenced in part by the lack of disciplinary action against the individually named defendants, show a likelihood of recurrence that is objectively unreasonable.

101. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain

and suffering, some of which is ongoing, and medical costs.

## COUNT IX

(1983 - Sharon)

102. Defendant Sharon, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th, 14th, and 8th Amendments to the U.S. Constitution by deliberately and intentionally failing to provide first aid or other medical attention to the Plaintiff's serious injury;

103. Defendant refused to provide medical treatment or assistance to the plaintiff for a serious injury that was obvious, that is, a fractured hip, and, with callous indifference ignored Plaintiff's pleas that her hip was broken. This in spite of the fact that Plaintiff informed her that she "fractured easily" and Defendant noticing "bruising and swelling and abnormality" on Plaintiff's left hip after her fall. An x-ray was not ordered and Plaintiff was left to suffer all day with a serious medical fracture to her hip.

104. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

105. The actions of Defendant violated clearly established and well settled federal constitutional rights of pretrial detainees as guaranteed by the 4th, 8th, and 14th Amendments to the U.S. Constitution.

## COUNT X

(1983 - Kelley)

106. Defendant Kelley, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th, 14th, and 8th Amendments to the U.S. Constitution by deliberately and intentionally failing to provide first aid or other medical attention to the Plaintiff's serious injury;

107. Defendant refused to provide medical treatment or assistance to the plaintiff for a serious injury that was obvious, that is, a fractured hip, and, with callous indifference ignored Plaintiff's pleas that her hip was broken. This in spite of the fact that Plaintiff informed her that she "fractured easily" and Defendant noticing "bruising and swelling and abnormality" on Plaintiff's left hip after her fall. Plaintiff was left to suffer all day with a

17

serious medical fracture to her hip, forced to walk without assistance despite the severe pain, and left to lay in her own feces.

108. As a direct and proximate result of the said acts of Defendant, Plaintiff experienced pain and suffering, emotional distress, and medical costs.

109. The actions of Defendant violated clearly established and well settled federal constitutional rights of pretrial detainees as guaranteed by the 4th, 8th, and 14th Amendments to the U.S. Constitution.

## PRAYER FOR RELIEF

Plaintiff requests that the Court award the following:

1. Judgment against Defendant Sumner County for compensatory damages in an amount to be determined at trial;

2. Judgment against Defendants Bozarth, Fox, Holscher, Sharon, Kelley individually, and jointly and severally, for compensatory and punitive damages for violation of the Plaintiff's Constitutional rights in an amount to be determined at trial;

3. Compensatory and punitive damages against Sumner County by virtue of their state statutory vicarious liability for the actions of deputies;

4. Injunctive relief in the form of an order compelling Sumner County to comply with Tennessee Corrections Institute and American Correctional Association standards regarding medical treatment of inmates and to place barriers on higher level bunks to prevent falls, properly train personnel and revamp its policies with regard to medical care for inmates;

5. Trial by jury on all issues;

6. Reasonable attorney's fees pursuant to 42 U.S.C. 1988;

7. Cost of suit and such other and further relief as the court deems just and proper.

Respectfully submitted,

/s/ Jerry Gonzalez
Jerry Gonzalez (18379)
Attorney for Plaintiff
2441-Q Old Fort Parkway
No. 381
Murfreesboro TN 37128
615-360-6060
jgonzalez@jglaw.net